## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **LOWER, LLC** | § | |
| **8621 Robert Fulton Drive, Suite 150** | § | |
| **Columbia, Maryland 21046** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **AMCAP MORTGAGE, LTD.** | § | **CIVIL ACTION NO. _____** |
| **9999 Bellaire Blvd., Suite 700** | § | |
| **Houston, Texas 77036** | § | |
| | § | |
| **JASON OZMENT** | § | |
| **307 Drew Lane** | § | |
| **Heath, Texas 75032** | § | |
| | § | |
| **RON HANKINS** | § | |
| **15950 Paramount Way Apt. 5417** | § | |
| **Frisco, Texas 75033** | § | |
| | § | |
| **NATALIE BOYD** | § | |
| **2605 Pickwick Lane,** | § | |
| **Plano, Texas  75093** | § | |
| | § | |
| **KRISTIN MASTRORILLI** | § | |
| **1303 Jonah Dr.** | § | |
| **North Port, Florida 34289** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

For its Complaint against Defendants AmCap Mortgage, Ltd. ("AmCap"), Jason Ozment,

Ron Hankins, Natalie Boyd, and Kristin Mastrorilli (collectively, "Defendants"), Plaintiff Lower,

LLC, formerly known as Homeside Financial, LLC ("Lower"), states, upon information and belief:

## NATURE OF THE ACTION

Lower brings this complaint to recoup losses in excess of $4,000,000 Defendants caused

Lower to suffer by virtue of the coordinated departure of Jason Ozment from his employment. Mr. Ozment is a disloyal and dishonest former employee of Lower who violated his agreement and duties to not take, retain, or use Lower's confidential information and trade secrets, or engage in unfair competition by improperly soliciting Lower's customers and employees. In fact, as part of its scheme AmCap acknowledges having utilized its "big company resources" while Mr. Ozment secretly worked together to coordinate Mr. Ozment's sudden and abrupt departure from his employment with Lower in November 2022,[1] which caused significant business disruptions and confusion on the part of Lower's customers and business prospects. Mr. Ozment damaged office space leased by Lower, and took without authorization Lower's physical property as well as Lower's trade secrets and confidential customer and proprietary business information. Lower seeks money damages from AmCap because it conspired with Mr. Ozment in his breach of his duties and obligations to Lower, its customers, and its employees, and was a participant in the anti-competitive scheme against Lower by causing it to incur costs for leased space that was renovated and reserved for Mr. Ozment's use.

Although the full extent of AmCap and Mr. Ozment's misconduct may not be uncovered for some time, Lower is aware that Mr. Ozment and AmCap's employees contacted Lower's customers and referrals for the purpose of soliciting them for business to be serviced by Mr. Ozment's team for the benefit and on behalf of himself and AmCap. And Mr. Ozment solicited Lower's employees to leave Lower and to accept employment with AmCap. Further egregious is that Mr. Ozment operates Oz Lending as a d/b/a of AmCap and has posted selected portions of customer reviews that misleadingly portray prior customer successes were a result of Mr.

---

[1] *See e.g.*, https://www.prnewswire.com/news-releases/amcap-mortgage-ltd-welcomes-oz-lending-orange-mortgage-and-rev-mortgage-to-family-of-brands-301743280.html

Ozment's relationship with AmCap when, in reality, those successes were obtained during the time that Mr. Ozment and Oz Lending were associated with Lower. And, Lower has discovered that Mr. Ozment misappropriated vast amounts of confidential business and trade secret information concerning its business and its customers, including account information and personal information about Lower's customers to improperly compete with Lower. By virtue of AmCap's employment of Mr. Ozment, Mr. Ozment's theft, retention, and/or misuse of Lower's property inures to the benefit of Mr. Ozment and AmCap while at the same time causing direct and continuing harm to Lower.

As its investigation into Mr. Ozmet's misconduct continued, Lower uncovered evidence that Mr. Ozmet had perpetrated a fraud upon Lower. Again he was not alone. With the help of former Lower—and now AmCap/Oz Lending—employees Ron Hankins (loan officer), Natalie Boyd (underwriter), and Kristin Mastrorilli (loan processor), the group followed improper mortgage lending practices and lied to Lower about doing so in order to further line their pockets. In doing so, these conspirators left Lower holding the bag, which is quite heavy and has caused Lower to incur millions of dollars in damages.

## PARTIES

1.      Plaintiff Lower is a limited liability company formed and existing under the laws of Maryland with operations in and around Dallas, Texas. Lower offers a variety of high quality residential mortgage loans and refinancing products and services for home buyers that are sold through individual loan officers and affiliated entities. Lower's sole member is Lower Holding Company, a Delaware corporation with its principal place of business in Maryland.

2.      Defendant AmCap is a limited company formed under the laws of Texas with its principal place of business in Dallas. AmCap currently employs Mr. Ozment, Lower's former

Branch Manager and Vice President, who stole a significant portion of Lower's physical and digital property. AmCap also does business as Oz Lending through which Lower's former employees now provide lending services in direct competition with Lower.

3.     Defendant Jason Ozment is an individual Texas citizen. Lower employed Mr. Ozment as a Branch Manager and Vice President until his sudden coordinated departure in November 2022.[2]

4.     Defendant Ron Hankins is an individual Texas citizen. At all relevant times, Lower employed Mr. Hankins as a loan officer working for and on behalf of Mr. Ozment.

5.     Defendant Natalie Boyd is an individual Texas citizen. At all relevant times, Lower employed Ms. Boyd as a loan officer working for and on behalf of Mr. Ozment.

6.     Defendant Kristin Mastrorilli is an individual Florida citizen. At all relevant times, Lower employed Ms. Mastrorilli as a loan processer working for and on behalf of Mr. Ozment.

### JURISDICTION AND VENUE

7.     This Court has personal jurisdiction over Defendant AmCap because AmCap is a Texas limited liability company with its principal place of business in Dallas whose member(s) are, on information and belief, citizens of Texas and all its suit-related conduct occurred in Texas.

8.     This Court has personal jurisdiction over Mr. Ozment, Mr. Hankins, and Ms. Boyd because they reside in Texas and all their suit-related conduct occurred in Texas.

---

[2] As is more fully described herein, Mr. Ozment was employed by Lower pursuant to the terms and conditions of the "Branch Manager, VP Employment Agreement" executed by Mr. Ozment and Lower. With the exception of claims for injunctive relief, the Employment Agreement states that all claims that arise out of or are related to Mr. Ozment's employment shall be submitted to arbitration. Therefore, Lower's employment-related claims will be resolved through arbitration. Agreement ¶¶ 6, 7.

9.      This Court has personal jurisdiction over Ms. Mastrorilli because she purposefully directed her actions towards Texas, purposefully availed herself of the privileges of conducting business in Texas, and Lower's claims arise out of and result from her Texas contacts.

10.      This Court has jurisdiction under 28 U.S.C. 1332 because Plaintiff's damages, exclusive of interest and costs, exceed $75,000, and complete diversity exists.

11.      Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in Collin County, Texas, including AmCap and Mr. Ozment's conspiracy, leading to Mr. Ozment's misappropriation of Lower's property including its confidential customer information and trade secrets originating from Lower's Plano, Texas office.

## FACTS

### A.      Lower Hires Mr. Ozmet as its Highly Trusted Employee.

12.      Lower provides high quality residential mortgage loans and refinancing products and services for potential home buyers and current home owners. Lower offers its services through individual loan officers and affiliated entities. The core of Lower's business is providing one-on-one comprehensive lending services to its current and prospective customers.

13.      Lower has invested significant time, money, and resources researching customer needs, developing marketing and business plans, creating lending products and services, and cultivating meaningful relationships with existing and potential customers, and continues to do so.

14.      Lower's development and maintenance of customer relationships depends in part, on its creation and use of its trade secrets and other confidential information, which it uses for the benefit of its clients and differentiates Lower from its competitors.

15.     Lower utilizes software, techniques, and other tools and has implemented significant measures to protect against the unauthorized use of its confidential information, trade secrets, and employee relationships, and in turn, its customer relationships.

16.     As part of Lower's efforts to protect against the unauthorized use of its confidential information, trade secrets, customer and employee relationships, when Lower hired Jason Ozment as a Branch Manager and Vice President in April of 2021 the parties executed a "Branch Manager, VP Employment Agreement" effective as of April 13, 2021, which was superseded by the "Branch Manager, VP Employment Agreement" effective as of September 1, 2021 ("Employment Agreement" or "Agreement"). A copy of the Employment Agreement is attached as **Exhibit 1**.[3]

17.     Mr. Ozment's role as Branch Manager and Vice President was to establish and grow Lower's customer base throughout the greater Dallas metropolitan region. Agreement ¶¶ 1.3(v) and 1.4. As a result, Mr. Ozment promised to "[d]evelop[] and maintain[] a network of relationships with existing and prospective clients, promoting the image and reputation of [Lower] as creative, dynamic and competitive, expanding [Lower's] market share through the promotion of [Lower's] business and sales." *Id.*, ¶ 1.3(v).

18.     Mr. Ozment also agreed to devote his activities to furthering, and not competing against, Lower's business. *Id.*, ¶ 1.4.

---

[3] Because the Employment Agreement contains confidential information, the publicly filed version of the Complaint does not attach Employment Agreement as Exhibit 1. Lower will provide a copy of the Complaint attaching Exhibit 1 to the Court for in camera review or will provide a copy to Defendants after the Court enters reasonable protective order or the parties otherwise agree that the contents of the Employment Agreement will be treated as confidential information under Fed. R. Civ. P. 26(c)(g). Lower submits that the withheld information is not necessary for the public to understand the claims in this case.

19.     In addition to his contractual obligations, due to the highly trusted and confidential nature of his relationship with Lower, Texas and Ohio law also imposed on Mr. Ozment a common law duty of loyalty to act for Lower's benefit as his employer.

20.     The Employment Agreement places significant limitations on Mr. Ozment's authorized access to and use of Lower's confidential information and trade secrets, including:

5.1 <u>Protected Information</u>.

(a) *Confidentiality*. Employee hereby acknowledges, understands and agrees that all "Confidential Material," as defined below, is the exclusive and confidential property of Company which shall at all times be regarded, treated and protected as such in accordance with this Article V. Employee acknowledges that all such Confidential Material is in the nature of a trade secret. For purposes of this Agreement, "Confidential Material" means information, which is available to or used in the business of Employee and (i) is proprietary to, about or created by Company, is known by Employee to be considered confidential by Company, or from all the relevant circumstances should reasonably be assumed by Employee to be confidential and propriety to Company. Such Confidential Material includes, without limitation, the following types of information and other information of a similar nature (whether or not reduced to writing or designated as confidential):

(i) Internal personnel and financial information of Company, purchasing and internal cost and revenue information, internal service and operational manuals, computer software and systems and the manner and methods of conducting the business of Company;

(ii) Company personnel names and contact information;

(iii) Employee's compensation arrangements with Company;

(iv) Training and educational materials provided by Company to Employee;

(v) Marketing materials and/or marketing plans . . .; and

(vi) Confidential and proprietary information provided to Company by any actual or potential customer, or other third party (including businesses, consultants and other entities and individuals), and shall include, without limitation, all of the customer's "non-public personal information," as that term is defined under the Gramm-Leach-Bliley Act of 1999.

(b) *Non-Disclosure*. As a consequence of Employee's acquisition or anticipated acquisition of Confidential Material, Employee shall occupy a position of trust and confidence with respect to the affairs and business of Company [and] Employee agrees that it is reasonable and necessary that Employee make each of the following covenants:

(i) At any time during the term of this Agreement and thereafter, except as required by law, Employee shall not disclose Confidential Material to any person or entity. . .

(ii) At any time during the term of this Agreement and thereafter, Employee shall not use, copy or transfer Confidential Material other than as necessary in carrying out the business of the Company . . .

(iii) Upon termination of this Agreement, Employee shall properly deliver to Company (or its designee) all written materials, records, software and documents made by Employee or which came into his/her possession prior to or during the term of this Agreement, concerning the business and affairs of Company, including, without limitation, all materials containing Confidential Material.

Agreement ¶ 5.1.

21.    Additionally, to protect against the unauthorized use of Lower's confidential information and trade secrets, the Employment Agreement contains non-solicitation provisions:

Non-solicitation of Employees. In order for the Company to reasonably protect its interests against the competitive use of any Confidential Information, knowledge, or relationships concerning the business of the Company to which Employee has access because of the nature of his or her employment, Employee shall not during his or her employment, and for a period of sixteen (16) months from the date of termination of his or her employment with the Company, solicit, employ or attempt to employ, directly or indirectly, alone or in concert with others, for himself or for any other person or entity, the employees of the Company who work or have worked in any area in which Employee has been engaged or involved on behalf of the Company . . . .

(a)    Non solicitation of customer and referral sources . . . during Employee's employment with Employer and for a period of sixteen (16) months following termination of employment, either voluntarily or involuntarily, Employee shall neither directly nor indirectly contact, solicit, nor induce any person, corporation, or other entity to contract or solicit, any person or entity who, or which, at any time during the term of Employee's employment or at the time of Employee's termination, was a customer, prospective customer or referral source of Employer . . . .

*Id.*, ¶ 5.2.

22.     By signing the Agreement, Mr. Ozment agreed, for 16 months after his termination, not to compete with Lower and to refrain from directly or indirectly, soliciting or attempting to solicit, any employees or business from any of Lower's customers. *Id*.

23.     Upon termination, Mr. Ozment agreed to immediately return, and retain no copies of, all loans and related information, documents files, correspondence and notes containing or relating to Lower's "Confidential Material," including information obtained from customers and prospective customers. *Id.*, ¶ 3.4.

24.     Mr. Ozment also agreed and acknowledged that any breach of the Agreement would cause Lower to suffer "irreparable harm" and "that any remedy available at law [would] be inadequate" and "in such event [Lower] shall be entitled to injunctive relief in any court of competent jurisdiction against [Mr. Ozment] and any other person or entity involved in or connected with such breach without necessity of posting any bond, cash or security . . ." and that such "rights shall be in addition to such rights as [Lower] may have for damages and in addition to such other remedies as the law or equity may provide." *Id.*, ¶ 5.4.

25.     In exchange for Mr. Ozment's undertakings under the Agreements, Lower provided Mr. Ozment with employment, compensation, continuing on-the-job training, extensive support services, facilities, equipment, market reporting services, business expenses, sales opportunities, and provided him with all Lower benefits, systems, advertising support, goodwill and name recognition, access and use of Lower's network of experts and resources.

26.     Because of Mr. Ozment's position as a Lower Branch Manager and Vice President, he had access to Lower's confidential information and trade secrets, including, but not limited to: customer identification, financial information, and lending objectives, and similar information that is highly confidential and proprietary to Lower.

27.     Lower's ability to protect its confidential information and customer relationships from unfair competition by departing employees is a lifeline of its business. Therefore, compliance with Lower's restrictive covenants and policies is critical to Lower's continued success.

28.     Prior to and during his employment with Lower, Mr. Ozment assured Lower that he would uphold the terms of his Employment Agreement and to be the ambassador of Lower's unique service oriented brand and reputation, which Lower has spent years developing.

29.     In reliance on Mr. Ozment's representations that he would uphold his contractual obligations and abide by his fiduciary duties, Lower granted Mr. Ozment access to its confidential and proprietary business information.

30.     Also in reliance on those same representations, Lower provided office space (located at 2805 North Dallas Parkway, Suite 150, Plano, Texas) ("Plano Office"), which it extensively renovated for use by Mr. Ozment and Oz Lending (a d/b/a used by Mr. Ozment) and Lower's employees employed at or associated with the Plano Office ("Plano Office employees") in order to facilitate Mr. Ozment's customer service and business development efforts for Lower.

**B.      Amcap and Mr. Ozment Conspire to Steal Lower's Property and Employees.**

31.     On information and belief, by mid-to-late 2022 (if not earlier), Mr. Ozment secretly entered into agreements with AmCap to leave Lower and to take Lower's information, customers, and the Plano Office employees with him to AmCap. Preparations began immediately.

32.     Prior to AmCap's trying to steal Mr. Ozment and Lower's Plano Office employees, AmCap knew of  Mr. Ozment's Employment Agreement, his duties as a Branch Manager and Vice President, and of his (and the Lower's Plano Office employees under his supervision) access to Lower's confidential and trade secret information.

33.     AmCap also knew that Lower provided and renovated the Plano Office for Mr. Ozment and Oz Lending to facilitate Mr. Ozment's daily work, business developments, and customer relationships on Lower's behalf.

34.     On information and belief, sometime before November 8, 2022, AmCap and Mr. Ozment agreed that Mr. Ozment would leave Lower and accept employment with AmCap. On or around the same time, AmCap and Mr. Ozment agreed that AmCap would offer jobs to Lower's Plano Office employees working with Mr. Ozment if they agreed to terminate their employment with Lower. AmCap had knowledge that Mr. Ozment planned to abandon the Plano Office space without adequate notice to Lower in a manner that would deprive Lower of any reasonable opportunity to transition the Plano Office to be used without disruption for Lower's business purposes or use by another tenant.

35.     On information and belief, in furtherance of AmCap's and Mr. Ozment's agreements and plans, Mr. Ozment removed, or caused to be removed, Lower's confidential and trade secret information as well as other property from the Plano Office with AmCap's knowledge and/or assistance.

36.     On information and belief, Mr. Ozment and/or Oz Lending possess Lower's property and by virtue of their relationship, AmCap is benefitting from Mr. Ozment's wrongful retention and unauthorized use of Lower's property.

37.     Lower trusted Mr. Ozment and allowed him to work independently with its customers and supervise Lower's Plano Office employees.  Mr. Ozment and Lower's Plano Office employees had access to confidential information and trade secrets concerning Lower's business and its customers. This is why Lower implemented measures to protect its confidential information, trade secrets, and customer relationships through its policies and restrictive covenant

agreements with employees like Mr. Ozment. Additionally, Lower had physical security measures in place to protect its property including access restrictions to its files and individualized badge access to the Plano Office in order to prevent unauthorized persons from entering the premises.

38.     To date, Lower has demanded, and Mr. Ozment and/or AmCap have not returned, Lower's confidential information and trade secrets. Rather, Mr. Ozment has improperly retained and used Lower's confidential information and trade secrets to solicit Lower's customers for his, and AmCap's, benefit thereby breaching the Agreement.

39.     Mr. Ozment's removal, retention, and use of the Lower confidential information and trade secrets violates the Employment Agreement as well as state and federal laws, as described below. As part of the Employment Agreement, Mr. Ozment agreed and acknowledged that in the event of any breach of any provision of the Agreement, Lower would suffer "irreparable harm" and "that any remedy available at law will be inadequate" and "in such event [Lower] shall be entitled to injunctive relief in any court of competent jurisdiction against [Mr. Ozment] and any other person or entity involved in or connected with such breach without necessity of posting any bond, cash or security . . ." and that such "rights shall be in addition to such rights as [Lower] may have for damages and in addition to such other remedies as the law or equity may provide." Agreement ¶ 5.4.

40.     Further demonstrating AmCap's and Mr. Ozment's continuing agreement to interfere with Lower's business relationships and engage in unfair competition, AmCap d/b/a Oz Lending and Mr. Ozment maintain a website located at https://ozlending.com.

41.     AmCap d/b/a Oz Lending and Mr. Ozment posted the following misleading customer reviews suggesting or implying that AmCap, rather than Lower, is responsible for the

favorable lending experiences and results they enjoyed during the time Mr. Ozment was with Lower:

"Bruce with Oz Lending was absolutely amazing! From our initial introduction, until our loan was fully funded, he was all my wife could ask for in a mortgage lender. He was responsive, courteous, and a great professional. He always gave me information that I felt was trustworthy and even encouraged us to explore other lenders when we first initiated contact with him. If we ever decide to into the home purchase market again, Bruce will **absolutely** be our choice for mortgage lending."

## C. Harris
May 9, 2022

"Excellent experience and direction throughout the entire process. Great job by the whole oz lending team!!!"

## Jeffrey Adkins
June 10, 2021

*See* https://ozlending.com/reviews-page/ ("Oz Lending is a DBA of AmCap Mortgage, Ltd.").

42.     Based on the foregoing, Lower alleges that AmCap participated, facilitated, and agreed with Mr. Ozment to engage in a scheme to: (a) convert Lower's property including confidential information and trade secrets; (b) wrongfully solicit and/or prepare to solicit Lower's customers to terminate their relationship with Lower and to do business with AmCap; (c) wrongfully solicit and/or prepare to solicit Lower's Plano Office employees to terminate their employment with Lower and to accept employment with AmCap; (d) engage in other such acts contrary to the terms, conditions, and provisions of the Employment Agreement and other Lower policies; and (e) unfairly compete with Lower by tortuously interfering with Lower's existing and future customer relationships.

43.     AmCap conspired and/or participated in a scheme with Mr. Ozment to, among other things, (i) induce Lower's Plano Office employees to abruptly leave Lower, (ii) facilitate Mr. Ozment's untimely departure and abandonment of Lower's business, and (iii) retain the ill-gotten benefits of Mr. Ozment's unauthorized removal and use of Lower's property, all of which is extreme and outrageous conduct.

44.     AmCap's and Mr. Ozment's wrongful plan described herein has directly and proximately caused Lower to suffer substantial financial losses, as well as significant damage to its reputation and goodwill.

**C.     Mr. Ozment and Others Leave Lower Holding High Risk Loans.**

45.     Before Mr. Ozment left Lower, he requested, and Lower agreed, to hire Defendant Ron Hankins.

46.     As part of his job, Mr. Hankins was responsible for identifying potential customers and working with underwriters to qualify potential customers for a loan from Lower by, among other things, obtaining valid proof that a loan would not create undue risk of potential financial loss or other harms to Lower.

47.     Defendant Natalie Boyd was employed as a Lower underwriter when Mr. Ozment worked for Lower. In that role, Ms. Boyd was responsible for confirming that the potential customers identified by loan officers, including Mr. Hankins and/or Mr. Ozment, met the qualifications for eligibility to receive a loan from Lower by, among other things, confirming that a loan would not create undue risk of potential financial loss or other harms to Lower.

48.     Defendant Kristin Mastrorilli was a Lower loan processor while Lower employed Mr. Ozment. As part of her job, Ms. Mastrorilli was responsible for confirming that the potential customers identified by loan officers, including Mr. Hankins and/or Mr. Ozment, met the qualifications for eligibility to receive a loan from Lower by, among other things, confirming that a loan would not create undue risk of potential financial loss or other harms to Lower.

49.     During their employment with Lower while doing business through Oz Lending, Mr. Ozment, Mr. Hankins, Ms. Boyd, and/or Ms. Mastrorilli agreed together to fraudulently cause

Lower to issue high risk loans while knowingly disregarding that at least 13 of the customers receiving these loans did not meet Lower's loan eligibility criteria ("High Risk Loans").[4]

50.     Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli falsely told Lower that they had followed Lower's lending processes and guidelines and that the High Risk Loans met Lower's loan eligibility requirements.

51.     Lower reasonably relied on Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli's false and misleading representations and issued the High Risk Loans.

52.     Mr. Ozment, Mr. Hankins, Ms. Boyd, and/or Ms. Mastrorilli engaged in the gross misconduct described herein to earn more money from Lower than they would have otherwise been owed had they not caused Lower to issue the High Risk Loans.

53.     As Branch Manager, Mr. Ozment was responsible for supervising all employees working for and/or on behalf of Mr. Ozment and to ensure that each complied with Lower's processes and guidelines, which he failed to do.

54.     By originating the High Risk Loans approved by the Defendants, Lower was required to buy back loans resulting in significant financial damages and may have to pay penalties and fees.

55.     As a direct and proximate result of Mr. Ozment's, Mr. Hankins', Ms. Boyd's, and/or Ms. Mastrorilli's fraud and conspiracy to commit fraud, Lower has suffered financial loss and other damages that exceed $4,000,000.00.

## COUNT I – PERMANENT INJUNCTIVE RELIEF

56.     Plaintiff incorporates all paragraphs above as if fully rewritten herein.

---

[4] Lower will provide redacted loan information upon the Court's entry of a mutually agreeable protective order or other acceptable assurances of confidentiality.

57.     By virtue of the foregoing and the claims alleged in this action, Lower has demonstrated that it will be succeed on the merits of its claims, and that a balancing of the equities favors the immediate issuance of a permanent injunction against Mr. Ozment and AmCap.

58.     Unless Mr. Ozment and AmCap are permanently restrained and enjoined, Lower will be irreparably harmed by Mr. Ozment's and/or AmCap's wrongful acts including:

   a.    Retaining confidential information and trade secrets which are solely Lower and its customers' property;

   b.    Interfering with customer relationships and accounts and disregarding the confidentiality of customers' records and financial dealings, loss of confidence and trust of customers, loss of goodwill, and loss of business reputation;

   c.    Posting misleading customer experiences and testimonials online;

   d.    Soliciting and inducing employees to leave Lower thereby damaging office stability, and creation of threats to the enforcement of reasonable contracts; and

   e.    Causing current and future economic loss the full scope of which is presently incalculable.

59.     Lower has no adequate remedy at law.

60.     As part of the Employment Agreement, Mr. Oz agreed and acknowledged that in the event of any breach of any provision of the Agreement, Lower would suffer "irreparable harm" and "that any remedy available at law will be inadequate" and "in such event [Lower] shall be entitled to injunctive relief in any court of competent jurisdiction against [Mr. Ozment] and any other person or entity involved in or connected with such breach without necessity of posting any bond, cash or security . . ." and that such "rights shall be in addition to such rights as [Lower] may have for damages and in addition to such other remedies as the law or equity may provide." Agreement ¶ 5.4.

61.     If Mr. Ozment and AmCap are permanently enjoined, neither Defendants nor any third parties will be unjustifiably, disproportionately, and irreparably harmed as Lower is merely seeking to stop Mr. Ozment's misconduct including improper competition, solicitation, and misappropriation of Lower's confidential, proprietary, trade secret information, and business opportunities.

62.     The public interest will be well-served by permanently enjoining a former employee from misappropriating and using, without authorization, Lower's confidential information and trade secrets to solicit Lower's customers. And no public interest is served by allowing a former employee to possesses and use confidential client information without the customer's consent.

63.     Lower therefore is entitled to a permanent injunction enjoining Mr. Ozment, directly or indirectly, and whether alone or in concert with others, including AmCap and its employees from:

      a.     Soliciting or otherwise initiating any further contact or communication with any Lower customer whom Mr. Ozment served, assisted others in serving, or whose name became known to Mr. Ozment while working for Lower for the purpose of advising said customers of his affiliation or for the purpose of inviting, encouraging, or requesting the transfer of business from Lower;

      b.     Soliciting or otherwise initiating any further contact or communication with any Lower customer whose records or information Mr. Ozment used in violation of the Employment Agreement. This specifically includes any customer whom Mr. Ozment (or those acting with him or on his behalf) may have contacted by mail, email, phone, text, message, social media, or otherwise through the use of any information obtained by Mr. Ozment while working for Lower;

      c.     Posting misleading customer testimonials and experiences online that attribute favorable lending experiences and opportunities to AmCap/Oz Lending rather than Lower;

      d.     Using, disclosing, or transmitting for any purpose, including solicitation of said customers, the information contained in the books, records, and documents of

Lower concerning its customers, including, but not limited to, (i) the names, addresses, and telephone numbers of the customers; (ii) financial information of said customers; and (iii) other confidential information, trade secrets, and commercially sensitive materials;

e.   Destroying, erasing, or otherwise making unavailable for further proceedings between the parties, any records or documents (including data or information maintained in any computer media or portable storage means or device) in Mr. Ozment's possession, custody or control, which were obtained from contain information derived from any Lower records, which pertain to Lower's customers whom Mr. Ozment served or whose names became known to Mr. Ozment while working for Lower, or which relate to any of the events alleged in this action; and

f.   Any and all other such acts as may be appropriate for injunctive relief.

## <u>COUNT II – BREACH OF FIDUCIARY DUTY</u>

64.   Plaintiff incorporates all paragraphs above as if fully rewritten herein.

65.   Lower placed significant confidence and trust in Mr. Ozment during their relationship allowing him to work in close contact with Lower's existing and potential customers. Lower also provided Mr. Ozment with access to its confidential information and trade secrets and the use of the Plano Office.

66.   Lower placed significant confidence and trust in Mr. Ozment to protect and develop Lower's business interests and act in the best interest of Lower at all times. And because Mr. Ozment was a Branch Manager and Vice President of Lower, he owed fiduciary duties to Lower to refrain from disclosing Lower's confidential information and trade secrets.

67.   Mr. Ozment was required to deal in the best interests of, and in good faith with, Lower and to refrain from self-dealing; to avoid improperly competing with Lower through soliciting Lower's customers and employees; to refrain from improperly accessing and using Lower's confidential, proprietary, and trade secret property; and to refrain from making misleading representations.

68.     On information and belief, Mr. Ozment agreed with AmCap that he would leave his employment with Lower in order to accept employment with AmCap, abandon Lower's business operations conducted through the Plano Office, and engage in unfair competition against Lower.

69.     On information and belief, Mr. Ozment agreed with or otherwise had a meeting of the minds with AmCap that Mr. Ozment would invite, solicit, induce, and/or encourage Lower's employees to leave Lower and that AmCap would offer such employees jobs at AmCap where they would use their knowledge and training obtained while employed at Lower in order to unfairly compete.

70.     On information and belief, Mr. Ozment further agreed with or otherwise had a meeting of the minds with AmCap that he would assist AmCap to invite, solicit, induce, and/or encourage Lower's employees to leave their employment with Lower and that AmCap would offer such employees jobs at AmCap in order to unfairly compete with Lower using the knowledge, training, and property obtained while working at Lower.

71.     Mr. Ozment violated his common law fiduciary duty of loyalty by taking advantage of Lower's training and resources and using Lower's confidential information and trade secrets to improperly solicit business and unfairly compete with Lower. As part of this scheme, Mr. Ozment caused the Plano Office to be damaged and abandoned the premises without adequate notice to Lower in such a manner that he knew would deprive Lower of any reasonable opportunity to transition the Plano Office to be used without disruption for Lower's business purposes or use by another tenant.

72.     As described above, Mr. Ozment further breached his duty of loyalty when he wrongfully took, or caused to be taken, massive amounts of confidential information and trade secrets

including customer and proprietary business information in preparation for soliciting Lower's customers, all while pretending to be loyal to Lower.

73. On information and belief, AmCap has knowledge that Mr. Ozment took and continues to retain Lower's property, including among other things, Lower's customer and proprietary business information to solicit Lower's customers.

74. Mr. Ozment has profited and continues to profit and/or otherwise benefit from his breach of his fiduciary duties to Lower.

75. As a direct and proximate consequence of AmCap's and Mr. Ozment's misconduct, Lower has suffered and will continue to suffer financial loss and harm to its reputation and goodwill.

76. Lower is entitled to money damages to compensate it for the injuries sustained by reason of AmCap and Mr. Ozment's misconduct in an amount to be proven at or before the trial.

## COUNT III – CONSPIRACY TO BREACH FIDUCIARY DUTY

77. Plaintiff incorporates all paragraphs above as if fully rewritten herein.

78. Lower placed significant confidence and trust in Mr. Ozment during his relationship with Lower allowing him to work independently and in close contact with Lower's existing and potential future customers. In order to complete his work, Lower also provided Mr. Ozment with access to its confidential information and trade secrets.

79. Lower placed significant confidence and trust in Mr. Ozment to protect and develop Lower's business interests and act in the best interest of Lower at all times. And as explained above, he was Lower's fiduciary, requiring him to deal in the best interests of, and in good faith with, Lower and to refrain from (i) self-dealing, (ii) improperly competing with Lower through soliciting Lower's customers and employees, and (iii) improperly using Lower's confidential, proprietary, and trade secret property.

80.     AmCap had knowledge of Mr. Ozment's fiduciary duties while Mr. Ozment worked for Lower.

81.     On information and belief, Mr. Ozment agreed with or otherwise had a meeting of the minds with AmCap that Mr. Ozment would leave his employment with Lower, accept employment with AmCap, and engage in unfair competition against Lower.

82.     On information and belief, AmCap further agreed with or otherwise had a meeting of the minds with Mr. Ozment that he would invite, solicit, induce, and/or encourage Lower's employees to leave their employment with Lower and that AmCap would offer such employees jobs at AmCap.

83.     On information and belief, AmCap further agreed with or otherwise had a meeting of the minds with Mr. Ozment that he would assist AmCap to invite, solicit, induce, and/or encourage Lower's employees to leave their employment with Lower and that AmCap would offer such employees jobs at AmCap.

84.     Mr. Ozment violated his fiduciary duties by taking, retaining, and using Lower's confidential information and trade secrets to improperly solicit business and compete with Lower.

85.     As described above, Mr. Ozment breached the duty of loyalty when he wrongfully took massive amounts of confidential information and trade secrets including in the form of customer and proprietary business information in preparation for soliciting Lower's customers, all while pretending to be loyal.

86.     AmCap has knowledge that Mr. Ozment took and continues to retain Lower's property, including among other things, Lower's customer and proprietary business information, to solicit Lower's customers.

87.     On information and belief, AmCap facilitated and conspired with Mr. Ozment to breach his fiduciary duties owed to Lower.

88.     AmCap and Mr. Ozment have profited and continue to profit and/or otherwise benefit from their conspiracy to have Mr. Ozment's breach his fiduciary duties to harm Lower.

89.     As a consequence of the AmCap's and Mr. Ozment's misconduct, Lower has suffered and will continue to suffer harm and financial loss.

90.     Lower requests relief to prevent Mr. Ozment and AmCap from further profiting from Mr. Ozment's breaches and specifically asks the Court to order Mr. Ozment to return to Lower all stolen confidential information and trade secrets.

91.     Lower is also entitled to money damages to compensate it for the injuries sustained by reason of AmCap's and Mr. Ozment's misconduct, in an amount to be proven at or before the trial.

## COUNT IV – TORTIOUS INTERFERENCE WITH CURRENT AND PROSPECTIVE CONTRACTUAL RELATIONSHIPS

92.     Plaintiff incorporates all paragraphs above as if fully rewritten herein.

93.     Lower had contracts to provide lending services to certain entities before Mr. Ozment terminated his employment with Lower.

94.     On information and belief, AmCap and Mr. Ozment worked together to create a scheme to cause Mr. Ozment to leave Lower and to take Lower's property, including confidential business information, so that Mr. Ozment (and others acting for the benefit or on behalf of AmCap) could contact Lower's customers and improperly solicit and induce them to become AmCap's customers through among other things: phone calls, in-person meetings, letters and/or brochures, digital messaging, and through the AmCap d/b/a Oz Lending's website located at https://ozlending.com.

95.     AmCap and/or Mr. Ozment improperly contacted Lower's customers and intentionally solicited or otherwise induced them to stop doing business with Lower and to enter into contracts with AmCap (directly and/or through Oz Lending) knowing and intending that such interference was substantially likely to occur and that it would be to Lower's detriment and loss.

96.     Lower also had established prospective business relationships with potential customers before Mr. Ozment left Lower.

97.     AmCap and/or Mr. Ozment improperly contacted Lower's prospective customers and intentionally solicited or otherwise induced them to stop doing business with Lower and to enter into contracts with AmCap (whether directly or through Oz Lending) knowing and intending that such interference was substantially likely to occur and that it would be to the detriment and loss of Lower.

98.     Lower would have entered into such prospective business relationship but for AmCap and Mr. Ozment's intentional interference.

99.     Lower also had contracts with employees for employment at the Plano Office before Mr. Ozment terminated his employment with Lower.

100.    On information and belief, AmCap and Mr. Ozment conspired and agreed to cause Mr. Ozment to leave Lower and to induce individuals employed by Lower to leave their jobs and to become AmCap's employees.

101.    On information and belief, AmCap and/or Mr. Ozment knew and intended such interference would harm Lower.

102.    As a direct and proximate consequence of AmCap and Mr. Ozment's improper interference, Lower has suffered damages and losses in the form of lost customer revenues, future earnings, recruitment costs, and other business expenses.

103.     Lower is entitled money damages to compensate it for the injuries AmCap's and Mr. Ozment's misconduct caused in an amount to be proven at or before the trial.

## **COUNT V – TRESPASS**

104.     Plaintiff incorporates all paragraphs above as if fully rewritten herein.

105.     Beginning in 2021, Lower leased the Plano Office space giving Lower access to the premises and the ability to conduct business operations there.

106.     While Lower employed Mr. Ozment, he had permission to enter the Plano Office to conduct business on Lower's behalf.

107.     Once Mr. Ozment terminated his employment with Lower on November 8, 2022, Mr. Ozment no longer had authority or permission to enter the Plano Office premises or to access Lower's property located therein.

108.     After Mr. Ozment left Lower, Lower informed AmCap that Mr. Ozment was not allowed to enter the Plano Office premises or to access Lower's property housed therein.

109.     Despite Mr. Ozment and AmCap's knowledge that Mr. Ozment was not authorized to enter the Plano Office or to access Lower's property housed therein, on November 30, 2022, Mr. Ozment intentionally entered the Plano Office without Lower's consent. That same day, Mr. Ozment purposefully directed other individuals who were not Lower employees to enter the Plano Office and remove Lower's property without Lower's authorization or consent.

110.     Mr. Ozment's entry, and the entry of other individuals he directed, into the Plano Office and removal of Lower's property without Lower's authorization or consent on November 30, 2022 interfered with Lower's right to possession and use of the Plano Office and to conduct its business without interruption.

111.    Lower is entitled to money damages to compensate it for the injuries sustained by reason of Mr. Ozment's misconduct, in an amount to be proven at or before the trial.

## COUNT VI – UNJUST ENRICHMENT

112.    Plaintiff incorporates all paragraphs above as if fully rewritten herein.

113.    Separate and independent from the Employment Agreement, Mr. Ozment promised Lower that he would undertake his best efforts to service Lower's customers and to develop Lower's business prospects.

114.    Separate and independent from the Employment Agreement, Mr. Ozment promised Lower that he would hire, train, and supervise Lower's employees at the Plano Office and ensure they used their best efforts to service Lower's customers and to develop Lower's business prospects.

115.    Separate and independent from the Employment Agreement, Mr. Ozment promised Lower that if he were provided use of the Plano Office, he would operate as Oz Lending and use the location as a platform to facilitate his provision of service to Lower's customers and to develop Lower's business prospects.

116.    By mid to late 2022 (if not earlier), Mr. Ozment was secretly entering into agreements and making preparations with AmCap to leave Lower and to take Lower's information and property as well as to induce Lower's customers and employees to do business with him and AmCap.

117.    By virtue of Mr. Ozment's position as an employee with Lower, he had access to certain records of Lower and the confidential information and trade secret contained therein, including, but not limited to: customer identification, customer financial information and lending objectives, and similar information that is highly confidential and proprietary to Lower.

118.     Prior to AmCap's offers of employment to Mr. Ozment and Lower's employees, AmCap had knowledge of Mr. Ozment's access to Lower's confidential information and of the representations made to Lower, as described above.

119.     On information and belief, sometime before November 8, 2022, AmCap and Mr. Ozment entered into an agreement that Mr. Ozment would terminate his employment and accept employment with AmCap. On or around the same time, AmCap and Mr. Ozment agreed that AmCap would offer jobs to Lower's employees working with Mr. Ozment if they agreed to terminate their employment with Lower.

120.     On information and belief, in furtherance of AmCap's and Mr. Ozment's improper agreements and plans: (1) Mr. Ozment removed and/or caused to be removed Lower's confidential and trade secret information and other property from the Plano Office with the knowledge and/or assistance of AmCap; (2) Mr. Ozment and AmCap solicited and/or otherwise induced Lower's employees to leave Lower and accept jobs with AmCap; and (3) Mr. Ozment did not use the Plano Office to facilitate service of Lower's existing customers and future business prospects during the entire duration of his employment with Lower.

121.     On information and belief, Mr. Ozment and/or those doing business as Oz Lending have possession of Lower's property, which by virtue of such relationship, AmCap has access to and is continuing to benefit from Mr. Ozment's wrongful retention and unauthorized use of Lower's property.

122.     To date, neither Mr. Ozment nor AmCap have returned Lower's confidential information and/or trade secrets taken by him, rather, he has retained and used without authorization Lower's confidential information and trade secrets to solicit Lower's customers and referrals.

123.     It would be unconscionable and unjust for AmCap and Mr. Ozment to be able to continue to retain the wrongfully secured benefits realized through the retention, unauthorized access, and use of Lower's property.

124.     As a consequence of AmCap's and Mr. Ozment's misconduct, AmCap and Mr. Ozment have been unjustly enriched.

125.     As a consequence of AmCap's and Mr. Ozment's misconduct, Lower has suffered and will continue to suffer harm and financial loss.

126.     Lower again requests that Defendants return the stolen property to Lower and that Lower be compensated for the harm and losses caused by AmCap and Mr. Ozment.

127.     Lower is entitled to money damages to compensate it for the injuries sustained by reason of AmCap's and Mr. Ozment's misconduct, in an amount to be proven at or before the trial.

## **COUNT VII – FRAUD**

128.     Plaintiff incorporates the paragraphs referenced above as if fully rewritten herein.

129.     Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli made false and material misrepresentations to Lower, including the following:

> a.   That Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli had complied with Lower's established lending practices and guidelines with respect to reviewing and approving the High Risk Loans, when in fact, Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli engaged in practices that violated established lending practices and guidelines by, among other things, deleting documentation, using editing software to manipulate executed documents, and offering financial incentives for favorable appraisals, *see, e.g.,* Exhibits 2 and 3, and Ms. Boyd admitted that she was "pretty lax and creative when it comes to making deals work." *See* Exhibit 4; and

> b.   That Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli had verified that each of the High Risk Loans met Lower's criteria to be eligible to receive a loan from Lower.

130.    Mr. Ozment as a Branch Manager was responsible for but failed to supervise the employees that were working for and/or on behalf of Mr. Ozment activities and ensure that such employees complied with Lower's processes and guidelines before causing Lower to issue the High Risk Loans.

131.    At the time Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli made their false and misleading representations, they knew that their representations were false and/or made such representations without knowledge of their truth.

132.    Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli intended that Lower would act upon their misrepresentations and issue the High Risk Loans and pay additional compensation to Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli.

133.    Lower reasonably relied on the false and misleading representations of Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli that they had followed Lower's lending processes and guidelines and that the High Risk Loans met Lower's loan eligibility criteria.

134.    Because of Mr. Ozment's, Mr. Hankins', Ms. Boyd's, and Ms. Mastrorilli's false and misleading representations, Lower issued the High Risk Loans and paid additional compensation to Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli.

135.    Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli engaged in the fraudulent and gross misconduct described herein in order to earn additional compensation from Lower to which they would not have otherwise been entitled had they not fraudulently caused Lower to issue the High Risk Loans.

136.    As a direct and proximate result of Mr. Ozment's, Mr. Hankins', Ms. Boyd's, and Ms. Mastrorilli's fraud, Lower has suffered financial loss and other damages that exceed $4,000,000.00.

## <u>COUNT VIII – CONSPIRACY TO COMMIT FRAUD</u>

137.    Plaintiff incorporates all paragraphs  above as if fully rewritten herein.

138.    Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli agreed to, and made, false and material misrepresentations to Lower, including the following:

  a.  That Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli had complied with Lower's established lending practices and guidelines with respect to reviewing and approving the High Risk Loans, when in fact, Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli engaged in practices that violated established lending practices and guidelines by, among other things, deleting documentation, using editing software to manipulate executed documents, and offering financial incentives for favorable appraisals, *see, e.g.,* Exhibits 2 and 3, and Ms. Boyd admitted that she was "pretty lax and creative when it comes to making deals work." *See* Exhibit 4; and

  b.  That Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli had verified that each of the High Risk Loans met Lower's loan eligibility criteria.

139.    Mr. Ozment as a Branch Manager was responsible for but failed to supervise the employees who worked for or on behalf of Mr. Ozment and ensure that such employees complied with Lower's processes and guidelines before causing Lower to issue the High Risk Loans.

140.    At the time Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli made the false and misleading representations, they knew that their representations were false and/or made such representations without knowledge of their truth.

141.    Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli intended that Lower would act upon their misrepresentations, issue the High Risk Loans, and pay additional compensation to Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli.

142.    Lower reasonably relied on the false and misleading representations of Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli.

143.    Because of Mr. Ozment's, Mr. Hankins', Ms. Boyd's, and Ms. Mastrorilli's false and misleading representations, Lower issued the High Risk Loans and paid additional compensation to Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli.

144.    Mr. Ozment, Mr. Hankins, Ms. Boyd, and Ms. Mastrorilli engaged in the fraudulent and gross misconduct described herein in order to earn additional compensation from Lower to which they would not have otherwise been entitled had they not fraudulently caused Lower to issue the High Risk Loans.

145.    As a direct and proximate result of Mr. Ozment's, Mr. Hankins', Ms. Boyd's, and Ms. Mastrorilli's conspiracy to commit fraud, Lower has suffered financial loss and other damages that exceed $4,000,000.00.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Lower, LLC respectfully requests the following relief, jointly and severally against Defendants AmCap Mortgage, Ltd., Jason Ozment, Ron Hankins, Natalie Boyd, and Kristin Mastrorilli:

1.    Mr. Ozment be permanently enjoined and restrained, directly or indirectly, and whether alone or in concert with AmCap or its employees from:

    a.    Soliciting or otherwise initiating any further contact or communication with any of Lower's customer whom Mr. Ozment served, assisted others in serving, or whose name Mr. Ozment learned while working for Lower for the purpose of advising said customers of his affiliation or for the purpose of inviting, encouraging or requesting the transfer of business from Lower;

    b.    Soliciting or otherwise initiating any further contact or communication with any Lower customer whose records or information Mr. Ozment used in violation of the Employment Agreement or the fiduciary duties he owed to Lower. This specifically includes any customer whom Mr. Ozment (or those working on his behalf) may have contacted by mail, email, phone, text, message, social media or otherwise through the use of any information obtained by Mr. Ozment while working for Lower;

      c.   Posting misleading customer testimonials and experiences online that attribute favorable lending experiences and opportunities to AmCap/Oz Lending rather than Lower;

      d.   Using, disclosing, or transmitting for any purpose, including solicitation of said customers, the information contained in the books, records, and documents of Lower or concerning its customers, including, but not limited to, (i) the names, addresses, telephone numbers of the customers; (ii) financial information of said customers; and (iii) other confidential information, trade secrets, and commercially sensitive materials;

      e.   Destroying, erasing, or otherwise making unavailable for further proceedings in this matter, or in any litigation or other proceeding between the parties, any records or documents (including data or information maintained in any computer media or portable storage means or device) in the possession, custody or control of Mr. Ozment, which were obtained from or contain information derived from any Lower records, which pertain to Lower customers whom Mr. Ozment served or whose names became known to Mr. Ozment while working for Lower, or which relate to any of the events alleged in this action; and

      f.   Any and all other such acts as may be appropriate for injunctive relief.

2.      Actual damages in excess of $75,000 the amount of which will be proven at trial;

3.      Pre-judgment and post-judgment interest on all damages at the highest rate allowed by law;

4.      Attorneys' fees and costs of the lawsuit; and

5.      Such other and further relief to which Plaintiff Lower, LLC may be justly entitled.

                       Respectfully submitted,

                       **FANNING HARPER MARTINSON**
                       **BRANDT & KUTCHIN**
                       A Professional Corporation

              By: */s/ Stephen D. Henninger*
                       **STEPHEN D. HENNINGER**
                       Texas Bar No. 00784256
                       shenninger@fhmbk.com
                       **JOHN F. ROEHM, III**
                       Texas Bar No. 17157500
                       jroehm@fhmbk.com

8140 Walnut Hill Lane, Suite 200
Dallas, Texas 75231
(214) 369-1300 (office)
(214) 987-9649 (telecopier)
**ATTORNEYS FOR PLAINTIFF**
**LOWER, LLC**

**SANNA-RAE TAYLOR**
Ohio Bar No. 0091302
srtaylor@taftlaw.com
**JULIAN P. JOHNSON**
Ohio Bar No. 0101554
jjohnson@taftlaw.com
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Phone: (513) 381-2838
Fax: (513) 381-0205
**ATTORNEYS FOR PLAINTIFF**
**LOWER, LLC**
**APPLICATIONS FOR ADMISSION**
**PRO HAC VICE PENDING**